## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CHANCE ADAMS | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil Action No.:_____ |
| | ) | |
| ATTORNEY GENERAL | ) | (Judge_____) |
| MERRICK GARLAND, U.S. | ) | |
| DEPARTMENT OF JUSTICE (DOJ) | ) | |
| 950 Pennsylvania Ave., NW | ) | |
| Washington, D.C. 20530 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**JACK K. WHITEHEAD, JR. (LA 17863)**
**11909 Bricksome Ave., Suite W-3**
**Baton Rouge, LA 70816**
**Telephone: (225) 303-8600**
**Facsimile: (225) 303-0013**
**Teamwhitehead@whitehead-law.com**
**Counsel for Chance Adams**

## COMPLAINT

COMES NOW Plaintiff, Chance Adams (hereinafter Adams), through undersigned Counsel, who avers as follows:

## JURISDICTION AND VENUE

1.

This action is brought against the Department of Justice through its Agency Head, Merrick Garland, under Title VII of the Civil Rights Act (hereinafter "Title VII"), 42 U.S.C. § 2000e, et seq., alleging sexual harassment, discrimination based on sex (male), race (Caucasian), sexual orientation (heterosexual), and retaliation/reprisal; and The Rehabilitation Act 29 U.S.C. §701, et seq. based on perceived mental disability.

2.

Jurisdiction is founded upon 42 U.S.C. §2000e-5(f)(3), 28 U.S.C. §1331, and 28 U.S.C. 1343(a)(3).

3.

The United States Attorney General Merrick Garland, in his official capacity as head of the Department of Justice, is a resident of, Washington, District of Columbia, where he performs his official duties.

4.

Pursuant to 28 U.S.C. §1391, The United States District Court for the District of Columbia is the proper venue.

5.

Adams's formal investigation of discrimination concluded on February 3, 2022 when he received a final Agency decision on his claims.

6.

Therefore, Adams has exhausted his administrative remedies under Title VII 42 U.S.C. § 2000e, et seq., and The Rehabilitation Act 29 U.S.C. §701, et seq.

## COUNT I
## Rehabilitation Act

7.

Plaintiff, Chance Adams, was employed by the United States Department of Justice, Federal Bureau of Prisons during the period alleged herein and up to the date of this filing.

8.

Defendant Attorney General Merrick Garland is the current Acting United States Attorney General and department head of the United States Department of Justice.

9.

The Agency employed Adams at Federal Corrections Institution Big Spring, Texas (hereinafter "FCI Big Spring") located at 1900 Simler Dr. Big Spring Texas.

10.

During the time relevant time period Adams was employed as a GS-12 Computer Services Manager.

11.

Chance Adams suffers from a mental disability known as Adjustment Disorder.

12.

Adjustment Disorder impacts the major life activities of sleeping, thinking, concentrating, breathing, communicating, and working.

13.

Mr. Adams informed management at FCI Big Spring of this disorder in 2016.

14.

Mr. Adams informed management at FCI Big Spring of this disorder in 2019.

15.

At all relevant times Mr. Adams was qualified to perform the duties of his position.

16.

At all relevant times Mr. Adams was able to perform the essential functions of his position.

17.

The Bureau of Prisons had knowledge of Mr. Adam's disorder due to his Department of Veterans Affairs paperwork.

18.

In disregard of Mr. Adams's disability, he was subjected to consistent screaming and demeaning comments by the Warden and CEO of FCI Big Spring Ricardo Marques Jr.

19.

Mr. Adams was subjected to jabs and rumors about his sexual preference and masculinity by the executive staff at FCI Big Spring.

20.

Mr. Adams was also subjected to screaming and demeaning comments by Donald Murphy, at the time the executive assistant at FCI Big Spring.

21.

Murphy would scream at Adams and when Adams would indicate he was confused by why Murphy was yelling at him, Murphy would admonish him and make him leave the area.

22.

Mr. Adams attempted to seek guidance from Associate Warden Greenfield about Mr. Murphy's behavior towards him, but was told he needs to grow up and ordered Mr. Adams out of his office.

23.

The executive staff at FCI Big Spring mistook Mr. Adams's different communication style as a lack of masculinity on the part of Mr. Adams.

24.

Chance Adams was a rising star in the Bureau of Prisons who quickly worked his way up from a correctional officer. FCI Big Spring was his first post as a manager and he expected his contributions to the FCI Big Spring Computer Services Department to lead to an IT Specialist

position at the Regional level. Unfortunately, it became quickly apparent to Mr. Adams that he was unwelcome at FCI Big Spring.

25.

Executive Assistant Donald Murphy, after assessing Adams, quickly began his attacks like a shark smelling blood in the water. The first event of harassment Adams can recall is where Murphy held his index, middle, and ring fingers in front of Adams and Murphy told him along the lines of "You're going to learn how to be team player. Read between the lines." This is a classic grade school insult wherein the index finger and ring finger are the "lines" and in between them is the middle finger. Murphy preferred using covert rather than overt threats when harassing his targets.

26.

On or about May 6, 2019, AW Aaron Greenfield (Acting Warden at the time) moved his office into the IT Office. Afterwards, Adams and his IT Specialist Billy Shubert were assigned to two different offices in two different sections of the FCI which caused the department to crawl along. This rather confusing move greatly impacted Mr. Adams' ability to run his department and is far from standard or suggested operating procedure. Murphy was the Acting AW at the time this decision was made and undoubtedly was involved in the decision.

27.

The next significant event was on Saturday, May 11, 2019. Adams was with his family when Murphy called Adams on Adams' government issued smartphone and then left a text message saying "Call Me".

6

28.

This phone was issued to allow Adams to troubleshoot network issues while inside the secure confines of FCI Big Spring. Adams was not "on call" and while off-duty this phone could be used as an alternative way to contact Adams for emergency technical support.

29.

However, he was not required to answer it nor was he required to be available to respond to it. Additionally, he was in another city with his family. See the January 30, 2019 Bureau of Prisons Memorandum "Updated Guidance re: Government-Purchased Smartphones and Tablets"

30.

Adams saw the message the following day and texted Murphy. Murphy replied that they would talk on Monday. On Tuesday, May 14, Murphy called Adams into his office to try and fix his laptop. Murphy began interrogating Adams about why he hadn't answered the phone over the weekend. Adams explained he was with his family in another city. Murphy was unsatisfied with this answer and gave Adams a direct order to answer the phone whenever he called. Adams stated he was hesitant to agree to the order because he was unsure if he would able to always comply while off-duty. Murphy became angry and told Adams to exit the office.

31.

Later in the day, Adams went back to Murphy's office after finding a possible solution for Murphy's laptop issue. He was still visibly angry and instructed Adams to read and sign the letter of counseling he wrote. Adams felt the letter was very unclear as to what exactly Adams was accused of violating. Adams questioned Murphy to clear up some of the confusion. Murphy

told Adams he has no rights as a non-bargaining employee, insulted him, and gave him a direct order to sign the letter of counseling. Murphy gave Adams a copy of the letter.

32.

Adams went to Acting Warden Aaron Greenfield immediately afterwards to seek guidance. Adams felt comfortable speaking with Greenfield as they had a good working relationship up to this point. Greenfield acted insulted by Adams' request for help improving his performance and berated him for coming to him after getting the letter of counseling. Adams stated it was difficult communicating with Murphy and only wanted Greenfield to help him improve his performance (this was Adams' first BOP post as a manager and wanted only a little guidance).

33.

Adams did not receive his Standards of Work/ Personal Work Plan for several weeks after being counseled. Murphy called Adams in to sign it. Murphy did not allow Adams adequate time to read and understand it. Adams asked for a copy and received one once AW Jason Hess became Adams' supervisor (September or October 2019).

34.

Adams called Regional Computer Services Manager Jon Simo for advice on how to avoid future incidents. Simo advised Adams to leave the BOP phone at the office and don't bring it home. Adams went to the Beast Feast (an after work barbeque) to notify Murphy that he would be leaving the government cell phone in the office but could be reached on his personal cell phone. Murphy was greatly displeased by this and ordered Adams to follow him to speak with Greenfield. This was all done within earshot and view of all employees attending the Beast Feast.

35.

Murphy's tone and body language suddenly became more aggressive as Adams explained his decision to Greenfield. Murphy again instructed Adams to answer his government issued phone whenever Murphy calls it. Murphy went on to state that maybe Adams was unable to perform his role as a manager and should submit a letter of resignation. This entire "conversation" occurred in a public setting with many coworkers within earshot. Adams stated he was more than willing to perform his duties (including answering Murphy's calls) but felt that an official disciplinary action for missing one phone call while off-duty was excessive and inappropriate. The event ended with Greenfield requesting the official guidelines regarding the government phone.

36.

Adams promptly provided the guidelines to Greenfield but Greenfield did nothing to prevent the abuse of the government phone. Adams kept the phone on him and answered faithfully to avoid future incidents. Because this conduct went unchecked, staff began using Adams' government phone at all hours as a direct line to Adams whenever they desired. Adams recalls frequent calls around midnight with former FCI Big Spring Case Management Coordinator Marie Jackson. Jackson would call Adams when her husband would forget or lose his log-in credentials, often well outside of reasonable hours.

37.

Warden Rick Marques began his assignment to FCI Big Spring sometime in late May 2019. Shortly thereafter, Murphy told Adams he was no longer allowed to make any calls outside of the institution without Murphy's prior approval. His reasoning was "He did not want anything to come back and embarrass the Warden." This further impacted Adams' ability to perform the

essential functions of his position and ability to run his department. IT Specialist Billy Shubert witnessed this interaction.

38.

Adams met with Marques to discuss Murphy's continually worsening abusive conduct towards Adams. Adams hoped Marques would help resolve the issues between Murphy and Adams. Adams broke down in tears and pleaded with Marques to get Murphy off his back and help him improve his performance. Marques did nothing to resolve the issues.

39.

On July 23-25, 2019, FCI Big Spring was scheduled for a Program Review. On July 22, 2019, Adams called VT (Vocational Training) Instructor Don Weeks (a contractor with FCI Big Spring) to go over the VT computer lab in anticipation of the Program Review. Mr. Weeks told Adams to just lie to the reviewer like the past managers did and say they did not have a lab. Adams was taken aback by this request and asked Weeks to repeat that, which Weeks did. Burnette witnessed this verbal exchange.

40.

The Bureau of Prisons had heralded FCI Big Spring for its high rate of inmates completing the VT program. Inmates received GEDs so there it should have been no secret that FCI Big Spring had a VT program. It turned out that FCI Big Spring was running non-standard and unauthorized workstations for this program. This lab was off the books from Regional and Central Offices point of view. A number computers were running out of date software or were running non BOP approved software.

41.

Adams informed Program Reviewer John Mangan of the computer lab's existence and its non-compliance. Mangan wanted to enter the lab to inspect just how badly the lab was non-compliant. Adams did not have access so he called Weeks to come in and open up the lab for inspection. Weeks opened up the lab and began updating some of the software while Mangan was distracted. Mangan inspected some of the work stations and noted his disbelief that the programs just so happened to update that particular day.

42.

Mangan told Adams the program needed to be shut down and to develop a plan to reopen it once compliant. Adams and Orr approached Greenfield and Murphy to suggest shutting down the lab and working to get the lab compliant (Marques was away from the institution at this time). Adams began drafting a memo to inform Marques about the situation with the lab but surprisingly Greenfield and Murphy agreed to shut down the lab. The lab was shut down and Adams informed Mangan of this.

43.

Sometime around August 19, 2019, Marques returned to the institution and asked why the lab was shut down. Greenfield and Murphy told Marques that Adams went rogue, shut it down, and while he was gone Adams was just doing what Adams wanted. Marques ordered the lab be reopened. The blame was placed on Adams since Greenfield and Murphy decided Adams was not part of the in-group, Adams had reported Murphy's harassment, and Adams was a threat to their culture of control and discrimination.

44.

This rogue lab was a stain on FCI Big Spring and the Bureau of Prisons. So much so that it was a discussion panel topic at the National Computer Services Manager meeting Adams was attending while the lab was being reopened.

45.

Mangan found Adams at the meeting and was furious that he reopened the lab. Adams told Mangan that he had been here the whole time and had nothing to do with the lab reopening. Mangan told Adams he was now unable to close the FCI Big Spring Program Review because the lab was running again.

46.

Adams experienced increased hostility from his coworkers because he formally reported this rogue lab to Mangan.

47.

Adams recalls a specific interaction with former FCI Big Spring Chief Psychologist Dr. Anne Tubb which occurred in Summer 2019. Adams and Shubert were in the chow hall to eat when Shubert said something to Adams. Immediately, Dr. Tubb turned around and, in a loud tone, began berating Adams in front of both staff and inmates about whatever was said by Shubert. Needless to say, Adams was greatly embarrassed being yelled at in front of coworkers and inmates. He then saw now retired FCI Big Spring Unit Manager Walter Williams and reported the incident to Williams.

48.

On September 10, 2019 things reached a breaking point. Disciplinary Hearing Officer (DHO) Harry Miller called Adams and asked him to update the FCI Big Spring Sallyport Teamsite Page with the names of the new Alternate DHOs. Adams did not know new alternate DHOs were announced so he called Warden Secretary Mary Franco to ask if new alternate Disciplinary Hearing Officers (DHOs) had been announced. Franco gave Adams the names, Adams thanked Franco, and hung up.

49.

BOP policy requires permission of the position's supervisor before updating the website with a new name and their position. BOP policy also requires the submission of "Help Desk Tickets" to complete IT tasks. This methodology ensures accountability as to who is accessing the BOP system and why.

50.

Adams called Franco again to ask Murphy if he could get permission to contact the Help Desk to update the names. Murphy exploded and screamed back that Adams was horrible at his job and if Adams needed education on how to perform his duties then Adams should come talk to Murphy. Murphy yelled so loud that Adams could clearly hear Murphy despite Franco being 10-15 feet away from the doorway of Murphy's office. Franco stated she did not wish to get in the middle of this and suggested Adams go see Murphy in person.

51.

Adams called former FCI Safford Computer Management Specialist Dan Bickford for advice on handling this situation. Bickford told Adams to bring the internal IT periodic bulletins to the meeting with Murphy. Murphy printed out the bulletins and walked over to the Admin Building.

52.

When Adams arrived at the Admin Building, he was stopped by Supervisor of Education John Allen Orr. Orr took Adams outside and told him that there was a going away party for former Case Manager Ian Coccozza in the conference room next to Murphy's office. Orr informed Adams that the entire party heard the conversation with Murphy. He suggested it was a good idea to not meet with Murphy at that moment. Coccozza was a very well-respected officer so the majority of the institution attended his going away party. Adams was absolutely filled with shame and embarrassment as he realized Murphy had insulted Adams' performance within earshot of most of the FCI personnel.

53.

Adams returned to his office from the Admin Building immediately after the DHO incident and called Jon Simo. Adams often confided in Simo and looked to him for guidance. Adams had drafted memos addressed to Marques to formally place Marques on notice of Murphy's harassment. Simo, meaning well, showed the memos to South Central Regional Director Juan Baltazar. Adams only wanted Simo's feedback on the contents of the memos and did not intend for Simo to show them to anyone else.

54.

RD Baltazar, friend of Marques, contacted Marques to discuss the memos with him. Marques called Adams someday shortly after September 10th. Marques was furious that Adams bypassed the chain of command and directly informed the Regional Director of the incidents at FCI Big Spring. Adams tried explaining that he did not want Simo to pass the memos on but it did nothing to repair the damage done.

55.

These memos were to formally report Murphy for violating the BOP Standards for Employee Conduct and The BOP Anti-Harassment Policy on three separate occasions. Adams intended to submit these memos to Marques after Simo finished proofreading the memos. Again, Adams was retaliated against for formally reporting violations of policy/staff abuses.

56.

This combined with Adams reporting the FCI Big Spring rogue lab (See Reprisal – Computer Lab) lead to open hostility between Marques and Adams.

57.

Sometime in October or September of 2019, FCI Big Spring was constructing an experimental secondary sonar fence. FCI Big Spring is located right off of a highway and contraband is frequently introduced to the institution from people throwing it over the wire fence. To combat this, FCI Big Spring was constructing a secondary fence that detected vibrations much further from the physical fence. The idea is that this second fence would give early alerts to security staff that people intending to introduce contraband were approaching and would give more time for the security teams to apprehend or stop them.

58.

This fence project was very important to both the BOP and FCI Big Spring because its success would likely lead to many institutions adopting a similar fence system. Accordingly, the BOP had very specific guidelines for the fence's construction and Marques had every incentive to ensure the project proceeded regardless.

59.

Facilities and IT were both the primary departments constructing the fence. Facilities had not gone over the specifications with Marques either. Both departments knew that Marques was not concerned with the fence complying with the BOP specifics and only wanted to make sure the fence was constructed so that BOP leadership would recognize his accomplishments.

60.

Construction was underway and Jason Hess was appointed as an AW during this time. Adams had no reason to believe that the specifications were provided to Hess and he wanted to inform him since the project was Hess' responsibility. Adams forwarded the specifications to Hess who in turn forwarded them on to Marques. Hess believed the specifications were newly added ones which Adams only had either access to or recommended.

61.

Marques was furious. He waited for Adams to arrive the next day and publicly reprimanded Adams in the front lobby. Marques believed Adams was contacting the Regional or Central Office about the fence project and the specifications resulted from Adams' conversations with these offices (this was not long after Adams disclosed the rogue lab). Marques forbade Adams

from making any calls outside of the institution without Marques' prior approval. Marques then shouted things along the lines of you will stay away from my fence, you will not ruin this for me.

62.

After this, Adams called Hess to ask why Marques acted like that. Hess informed Adams that he forwarded the specifications to Marques. Adams explained that these were received nearly a month prior and he provided them to Hess so he would be in the loop. Hess mistakenly believed these were newly provided specifications. Hess explained the situation to Marques and the matter was never brought up again.

63.

Ultimately Adams was removed from the fence project because Marques believed Adams was bypassing Marques and reporting violations to the Regional or Central Office. Furthermore, Marques never contacted Adams for any IT issues after this. All IT issues were reported to Shubert who was to pass the messages on to Adams. Adams was again retaliated against because he was seen as a threat to the FCI Big Spring culture of control and harassment.

64.

Marques returned from yet another vacation sometime during the construction of the sonar fence (October or September 2019) Adams attempted to meet with him to go over the fence specifications sent down from the BOP Central Office. Marques completely avoided the conversation and instead inquired why he did not have a "hot spot" set up for his government issued phone. The older phones were authorized to have hot spot capabilities but were discontinued after a BOP employee took the phone outside the country. This employee racked up substantial roaming charges for using the hot spot.

17

65.

Obtaining one of these phones through official channels was impossible, as only those phones "grandfathered in" were allowed to keep their hot spots. Marques did not like this answer and told Adams to do everything necessary to get him a hot spot phone regardless if it was through proper and official channels (there is a sort of black market within the BOP for these grandfathered phones). Adams told the warden he would not risk his career by getting a hot spot phone through these back channels. Marques became angry and ordered Adams to exit the office. Adams called Simo again after this to confirm Adams' understanding that it was impossible to get a legitimate hot spot and Simo confirmed.

66.

In the end, Adams took a lower position at FMC Fort Worth. It was not announced to the institution. He endured harassment on a daily basis from executive management and knew his career would die at FCI Big Spring if he did not leave. Word of Adams' placement got out to Marques who sent Hess to Adams with a message. Hess congratulated Adams for getting placed at FMC Fort Worth and then delivered Marques' message. Marques' message was "Adams could leave as soon as possible, tomorrow if he wanted." This message was outside the usual waiting period between the post announcement and departure of the institution but is clear evidence of Marques' clear disdain for Adams.

67.

Finally, it is customary for an institution to give every officer a parting gift for their service to the institution. FCI Big Spring has an excellent wood working program so departing officers were usually given handcrafted wooden plaques as thanks. Adams received no such plaque.

Shubert asked HR where Adams' plaque was and Shubert was told Adams should not expect one. General Foreman Stephen Burnette normally oversees the production of these plaques and was disgusted that management was refusing to issue Adams a plaque.

68.

At any point before the final hour (March 1, 2020) Adams could have changed his mind and decided to stay at FCI Big Spring. His ultimate decision was made on February 29, 2020 when he decided he was going to depart FCI Big Spring.

69.

As a direct and proximate result of the Agency's unlawful and discriminatory conduct, Adams suffered severe mental anguish and emotional damages, in addition to financial damages.

70.

Plaintiff prays for a trial by jury.

WHEREFORE CHANCE ADAMS PRAYS, that, after due proceedings are had:

1) This Honorable Court issues a finding of a hostile work environment;

2) This Honorable Court issues a finding of Title VII Discrimination

3) This Honorable Court issues a finding that the Defendant violated the Rehabilitation Act.

4) A Judgment is rendered in his favor;

5) He be awarded all appropriate backpay due unto him with interest;

6) He be awarded all appropriate front pay due unto him with interest;

7) The amount awarded for 5) and 6) is adjusted to the respective rates during each aggrieved period;

8) He be awarded compensatory damages for the mental anguish suffered;

9) He be awarded compensatory damages for expenses incurred due to the move from Big Spring to Grand Prairie.

10) He be awarded compensatory damages for the loss of income due to inability to operate his private business in Pennsylvania;

11) He be awarded compensatory damages for any lost value of his Pennsylvania home;

12) He be awarded compensatory damages for any expenses in acquiring a new house in Texas;

13) The Defendant is ordered to pay market rate attorney fees to Whitehead Law Firm;

14) The Defendant is cast for all costs of this proceeding; and

15) For any other remedies justice may require.

**Respectfully Submitted by:**

**Whitehead Law Firm**

**By:   s/Jack K. Whitehead, Jr.          **
**JACK K. WHITEHEAD, JR. (LA 17863)**
**11909 Bricksome Ave., Suite W-3**
**Baton Rouge, LA 70816**
**Telephone: (225) 303-8600**

**Facsimile: (225) 303-0013**
**Teamwhitehead@whitehead-law.com**
**Counsel for Chance Adams**